# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF GEORGIA
# SAVANNAH DIVISION

| | | |
|---|---|---|
| ROBERT LESLIE FALLIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV417-216 |
| | ) | |
| LT. FLOOD, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

Robert Fallin, an inmate at Chatham County Detention Center, seeks to recover money damages in this civil rights action filed against "Lt. Flood," the "head" of Savannah-Chatham Metro Police Department's "SWAT Team," the "head" of the police "robot team," District Attorney Meg Heap, and Christopher Boyette, John Little, and Daniel Keng, whose roles in the case are unclear as they are never referenced in the body of the Complaint. Doc. 1 at 1 & 4. He summarizes his Complaint as "involv[ing] the attempted murder of me during my arrest and the subsequent cover-up by officers of the Court in Chatham County." Doc. 1 at 4. Preliminary screening of his

Complaint shows that Fallin's case must be dismissed.[1]

Unedited and in full, Fallin alleges the following:

3 Savannah Chatham Metro Police responded to my wife Millie Fallin's 911 call. Millie told them that she was afraid to go home because she and I had an argument; and that I had threatened to kill her and the police. She told them I was sleeping, but that I had a loaded shotgun by the bed. Police took no security precautions and came over to my partially open front door. Something woke me up and removed my CPAP mask, which prevents me from hearing all but the very loudest sounds. I called for Millie through the partially shut bedroom door, but heard no response. At that time I saw my front door was partially open, peering through shut blinds, I saw a man, upper torso, dressed in a yellow-green rain jacket with no visible markings, as all I could see was the left sleeve. Since my wife <u>never</u> leaves the door unlocked, much less open, I thought she had complained to her bar buddies at Rachel's 1190 that I had hit her lightly on the head and, accidentally, on the shoulder after she threated to tell police I hit her when I had <u>not</u> touched her, then yelled, "He hit me!" loud enough for neighbors to hear. I kept the loaded shotgun next to the bed after Millie called the police a few years earlier and claimed someone had come to our porch and pointed a gun at her.

In any event, I saw the would be intruder push the door further open after I went over to pick up the shotgun, I did not realize until then the man at the door was a police officer, as I saw

---

[1] District courts have the inherent power to dismiss *sua sponte* frivolous lawsuits, even those where the plaintiff pays the full filing fee. *See Cuyler v. Aurora Loan Services, LLC*, 2012 WL 10488184 at * 2 (11th Cir. 2012) (notwithstanding filing fee payment, "a district court has the inherent authority to dismiss a patently frivolous complaint"); *Jefferson Fourteenth Assocs. v. Wometco de Puerto Rico, Inc.*, 695 F.2d 524, 526 n.3 (11th Cir. 1983) (noting that courts may *sua sponte* dismiss actions for lacking merit "if the proper procedural steps are taken and if the determination is correct on the merits"); *Wilkerson v. Georgia*, 2014 WL 3644179 at * 1 (S.D. Ga. July 21, 2014) (dismissing *pro se* complaint on frivolity grounds even though plaintiff paid full filing fee), *rev'd on other grounds*, 618 F. App'x 610 (11th Cir. 2015).

"Police" on the back of his rain jacket as he and two other police officers ran, I lowered, then put down the shotgun, went to the front door, <u>unarmed</u> and making no attempt to conceal myself, examined the front door, waited for police to call, then shut and locked the front door and went back to sleep. Rather than keep my apartment under surveillance (so they would have seen me at the front door), the officers called in a S.W.A.T. team. While I slept, the S.W.A.T. team position a small robot outside my front door. The robot had an arm and a video camera. Also, during the time I had brandished the shotgun, I must have popped the window shade, as it was open. So the robot and the S.W.A.T. team had a clear view that I was asleep and <u>not</u> a threat, should officers have approached my window and arrested me at gun point.

Instead, I awake and pull off my CPAP mask to the sound of a bull horn and the sight of a tracked robot with a video camera. I was irate. I initially refused to come out because of the unreasonable force being used, as I feared I would be injured or worse. However, after less than two minutes of negotiating, the small robot smashed my window, pelting me with glass. I screamed a protest, which was <u>not</u> presented in court (nor was the robot video), and the robot began battering at my front door. Panicking, I picked up the shotgun, unloading it into the robot. I then threw a can of bacon grease onto the robot treads to foul them, in case the robot was not completely dead. But it did <u>not</u> move. I then laid back down, put on my mask and went back to sleep. Rather than arrest me, those who removed the robot let me sleep, even though I was now readily accessible through the broken window.

Once again, I awoke to the bull horn. Taking off my mask, I screamed at the negotiator about how the robot had smashed my window. However, after about one minute, I agreed to get on the house phone. However, just as I made contact with the negotiator, the S.W.A.T. team began firing C.S. tear gas into my apartment. Furious, I disconnected the phone and went back and lay on the bed. Before I could put on my mask, a ferret round passed about 1 ½ inches from my abdomen. I calmly went to the bathroom, wiped my face with a wet towel, put on my CPAP mask and went to sleep.

By their own admission, S.W.A.T. inserted enough CS tear gas to kill me many times over. Since CS tear gas is also flammable, the SWAT team could, conceivably, burn down the building or a large portion of the apartment complex.

I slept until the police shut off power to my apartment. As I removed my mask, I began hearing what I thought was lethal small arms.

I gathered weapons and fired into the ground approximately 3 feet beyond the sidewalk in front of my apartment, but clearing the bushes. This was suppression fire, because I did not want anyone hurt while trying to rush my apartment. Likewise, I used taunting to encourage extreme caution. However, while executing suppression fire, I made <u>no</u> attempt to conceal myself. Yet, sharpshooters never shot me.

I was confused and disheartened; as I believed I had done everything possible to delay arrest until cooler heads prevailed, so I could avoid losing my life. Finally, I chose suicide by cutting my brachial arteries with a 6" butcher knife. I chose this form of suicide because I thought I would have more control of my death.

However, I decided it took more courage to live than to die. But, before I could put away the knife, a large police robot broke through my front door and started approaching me. I sensed danger; and I began cutting wires on the robot. Turns out, the robot was equipped with a shotgun shell to blow off my face and an explosive charge "to breach the door". Since the small robot could have breached the door, the 500 pound large robot certainly could. Thus, the purpose of the explosive charge was to cover up the evidence that I had been murdered by the shotgun shell.

The raid was illegal, the S.W.A.T. team commander knew it; and, had I surrendered any time earlier in the raid, I would have been "accidentally" shot.

Clearly, the District Attorney's office realized the raid was an illegal "home invasion." Thus, the D.A. and prosecutor used every effort to deny me Veteran's Court. This included enlisting Dr.

4

Jennifer Rohrer in denying I had previously undiagnosed PTSD. For this, she likely conspired with Superior Court Judge Penny Freesemann. Superior Court Judge Timothy Warmsley also likely conspired, dragging my wife Millie's psychological evaluation until after I was convicted. Judge Warmsley also illegally ordered Georgia Heritage Credit Union to dispense funds from my personal savings account (not a joint account). Sheriff John Wilcher's deputies delivered protective orders which stripped me of my income without due process. Not surprising, as this case could involve a huge lawsuit, arrest of law enforcement, the D.A.'s office and Superior Court judges. Damages to Chatham County revenue could run into the hundreds of millions.

- - -

Sheriff Wilcher used a "separation form" to "legally" remove the banker, who died under mysterious circumstances ("apparent suicide") in the fall of 2016. He also almost succeeded with me on Oct 28, 2017. I had been moved after over a week alone, into a room with a roommate who intimidated me over my snoring. Had I insisted I be moved, Corporal Metter said he would have to fill out a "separation form" and BOTH of us would have been moved OUT of the Veteran's pod, even though I was the victim. Outside the Veteran's pod, I would have probably been found "an apparent suicide."

"While I would like to move to another room, if possible, because of the incidents that occurred last night, I am more concerned that David Jackson was standing near Officer Morrell when I told him about my concerns about my roommate, and I asked for his advice. I placed a counselor request for advice."

The incident I describe above began on Thursday. My roommate first complained about my card shuffling for the first time several days after I entered the room. This was in the middle of the day; but, my roommate, Mr. Johnson, sleeps most of the time. He has sleep apnea, as do I, and snores loudly as do I. However, while I have never complained about his snoring, on Friday in the late afternoon, in an angry voice, Mr. John ordered me to turn on my

5

side and said I belonged in a single room in 1D, the mental area of the jail. I reported this to Officer Morrel and asked for his advice. Officer Morrel suggested I contact the counselor. However, another inmate overheard my conversation and told Mr. Johnson I was trying to get him thrown out of the dorm. Saturday morning about 2AM, Mr. Johnson rapped his can so hard against the wall of the cell, he woke me from a sound sleep; and I did not go back to sleep all night. I reported this to officer Morrell. Mr. Johnson was called out to the hub; however, no disciplinary action was taken against him. Later, after I began the note to Corporel Metzler, he stopped by my cell and told me the watch sergeant had rejected my move; and that all Corporal Metzler could do was fill out a formal move request and have <u>both</u> <u>me</u> and Mr. Johnson removed from the dorm. Sunday morning, I was in too much pain from my back for cleanup; Mr. Johnson angrily insisted I get up; and I screamed in agony trying to do back exercises to comply with his demand.

Doc. 1 at 5-18.

Liberally construed, Fallin's *nappus interruptus* Complaint waves at claims of illegal search and seizure, excessive force, malicious prosecution, and an Eighth Amendment claim for failure to protect from another inmate. But he doesn't allege the essential elements of any of them. Not only that, his detailed recitation of the events establishes that he is lucky to be alive *not* because law enforcement officers failed in their attempt to "murder" him, but rather because they used exceeding restraint in dealing with an apparently deranged suspect who resisted his lawful arrest by displaying and discharging weapons upon

6

their approach. To say that Fallin pleads himself out of court is a great understatement.

The legality of the police conduct under the circumstances he describes cannot be disputed. Clearly, there was no "illegal" raid here. Nor was there any excessive force on the part of the responding officers. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (quotes and cites omitted).

> Because "[t]he test of reasonableness under the Fourth Amendment is not capable of a precise definition or mechanical application," . . . its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

*Id.* (cites omitted). The Court examines "the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balanc[ing] the risk of bodily harm to the suspect against the gravity of the threat the officer sought to

eliminate." *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009) (citing *Scott v. Harris*, 550 U.S. 372, 383 (2007)). "Although some amount of force is generally needed to subdue a suspect, the amount used must be reasonably proportionate to the need for force." *Smith v. LePage*, 834 F.3d 1285, 1294 (11th Cir. 2016); *see also Scott*, 550 U.S. at 383 (observing that in determining whether the Fourth Amendment was violated, "we must still slosh our way through the factbound morass of 'reasonableness.'").

Here, Fallin's own allegations show that he had hit his wife (more than once), told her that he would kill her and any police officers who intervened, and was known to be armed with a loaded shotgun. In response to a person posing a clear threat to their safety, officers twice deployed robots to peacefully investigate, repeatedly attempted to de-escalate the situation with a negotiator, and declined to employ lethal force (using CS tear gas instead) even when he laid down "suppression fire," shot the first robot, and attacked the second robot with a butcher knife. Doc. 1 at 5-14. He also fails to allege *any* injury whatsoever -- the "ferret round" whizzed past him and the tear gas was neutralized with a wet towel. *Id*. Indeed, the closest he comes to alleging a sustained injury

8

is his repeatedly interrupted sleep attempts. That is clearly deficient, without even reckoning with any possible immunity defense. His excessive force claim is dead on arrival.

Nor has Fallin made out a malicious prosecution claim against the district attorney who indicted him or the superior court judges who allegedly "conspired" to violate his rights. Setting aside the immunity such officials enjoy for actions taken in the performance of their official duties, Fallin has failed to plead an essential component of such a claim. The tort of malicious prosecution, which "remedies detention accompanied . . . by wrongful institution of legal process," *Wallace v. Kato*, 549 U.S. 384, 390 (2007), requires that the criminal prosecution be terminated in plaintiff's favor. *Wood v. Kesler*, 323 F.3d 872, 882 (11th Cir. 2003). Fallin concedes that he was convicted and incarcerated for his conduct during the SWAT team siege arising from his domestic dispute. *See* doc. 1 at 15; *see also State v. Fallin*, CR16-0749 (Chatham County Criminal Division) (guilty plea entered for five felony counts of aggravated assault on a peace officer, one felony count of interference with government property, and one felony count of abuse of an elderly/disabled individual). He cannot bring suit challenging his

malicious prosecution on those charges until that conviction is overturned.[2]

Fallin's claims regarding the conditions of his confinement are so unrelated to his pre-incarceration excessive force/wrongful prosecution claims as to warrant treatment in a separate suit. But as they are plainly insubstantial, the Court will address them here. While the Eighth Amendment does impose a duty on prison officials to take reasonable measures to ensure the safety of inmates in their custody, *Farmer v. Brennan*, 511 U.S. 825, 828 (1994), a prisoner asserting that his custodians failed to protect him from harm must establish that: (1) he was exposed to a substantial risk of serious harm (an objective

---

[2] Since his state court criminal proceeding has been finalized into a conviction, any malicious prosecution claim necessarily implies its invalidity. Accordingly, § 1983 affords him no remedy: "[A] prisoner in state custody cannot use a § 1983 action to challenge the fact or duration of his confinement. . . . He must seek federal habeas corpus relief (or appropriate state relief) instead." *Wilkinson v. Dotson*, 544 U.S. 74, 78 (2005) (quotes and cites omitted); *Heck v. Humphrey*, 512 U.S. 477, 481 (1994) ("[H]abeas corpus is the exclusive remedy for a state prisoner who challenges the fact or duration of his confinement and seeks immediate or speedier release, even though such a claim may come within the literal terms of § 1983."). And before he can bring a federal habeas action, he must first exhaust his available state remedies through either a direct appeal or another petition for state collateral relief. *Wilkinson*, 544 U.S. at 79 (federal "habeas corpus actions require a petitioner fully to exhaust state remedies, which § 1983 does not"); 28 U.S.C. §§ 2254(b), (c). Fallin appears to be in the process of pursuing state habeas relief; that avenue, however, is not yet exhausted. *See Fallin v. Wilcher*, SPCV17-01068-KA (Chatham County Habeas Court, filed November 3, 2017).

inquiry); (2) prison officials were "deliberately indifferent" to that risk -- *i.e.,* that they *knew of* but disregarded that excessive risk (a subjective inquiry); and (3) there is a causal connection between the official's acts or omissions and the alleged constitutional deprivation. *Id.* at 828, 837; *see Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003) (*per curiam*) (only prison officials who are "subjectively aware" of a serious risk of harm have the "'sufficiently culpable state of mind'" required by the Eighth Amendment). Fallin asserts that his roommate: ordered him "in an angry voice" to turn on his side and get up to appear for their work detail (unaccompanied by even the *threat* of physical violence), stated that Fallin should be housed in the mental unit, manifested irritation with Fallin's snoring and roommate switch requests, and "rapped his can so hard against the wall of the cell[ that] he woke [Fallin] up from a sound sleep." Doc. 1 at 17-18. These claims fall far short of establishing that, objectively, Fallin faced "a substantial risk of serious harm." *See Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (a plaintiff must prove the condition he complains of is sufficiently serious to violate the Eighth Amendment); *see also Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (a prison official must be faced

with a known risk of injury that rises to the level of a "strong likelihood rather than a mere possibility" before his failure to protect an inmate can be said to constitute deliberate indifference). Moreover, Fallin admits that prison officials *are* responsive to his alarms -- he was able to lodge a request for a roommate switch, which was denied, and Johnson was called to a disciplinary hearing for Fallin's complaints. *Id.* at 18; *see also Galloway*, 352 F.3d at 1349 (the right to safety is violated when prison officials show a deliberate indifference to a substantial risk of serious harm."). Nothing about Fallin's treatment by prison officials rises to an Eighth Amendment claim here.

Though a *pro se* prisoner normally should be given an opportunity to amend his complaint at least once, *see, e.g., Johnson v. Boyd*, 568 F. App'x 719, 724 (11th Cir. 2014); *Duff v. Steub*, 378 F. App'x 868, 872 (11th Cir. 2010), "a district court need not allow amendment if the amended complaint would still be subject to dismissal." *Jenkins v. Walker*, 620 F. App'x 709, 711 (11th Cir. 2015). Plaintiff's claims are dead on arrival, and do not appear amendable.[3]

---

[3] Despite the lack of any apparent basis for viable amendment, Fallin's opportunity to object to this Report and Recommendation within 14 days of service, see *infra*, affords him an opportunity to resuscitate his case. He may also submit an Amended

This Report and Recommendation (R&R) is submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72.3. Within 14 days of service, any party may file written objections to this R&R with the Court and serve a copy on all parties. The document should be captioned "Objections to Magistrate Judge's Report and Recommendations." Any request for additional time to file objections should be filed with the Clerk for consideration by the assigned district judge.

After the objections period has ended, the Clerk shall submit this R&R together with any objections to the assigned district judge. The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to timely file objections will result in the waiver of rights on appeal. 11th Cir. R. 3-1; *see Symonett v. V.A. Leasing Corp.*, 648 F. App'x 787, 790 (11th Cir. 2016); *Mitchell v. United States*, 612 F. App'x 542, 545 (11th Cir. 2015).

---

Complaint during that period, if he believes it would cure the legal defects discussed above. *See Willis v. Darden*, 2012 WL 170163 at * 2 n.3 (S.D. Ga. Jan. 19, 2012) (citing *Smith v. Stanley*, 2011 WL 1114503 at * 1 (W.D. Mich. Jan. 19, 2011)).

**SO REPORTED AND RECOMMENDED,** this  5th  day of December, 2017.

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA